**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| EUGENA A WATSON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Cause No. 1:25-cv-00343-ALT** |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, *sued as Frank Bisignano,* | ) | |
| *Commissioner of the Social Security* | ) | |
| *Administration,* | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Eugena A Watson appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for Supplemental Security Income Benefits (SSI), Disability Insurance

Benefits (DIB), and Period of Disability. (ECF 1). Watson filed her opening brief on December

4, 2025, and the Commissioner filed a response in opposition on March 12, 2025. (ECF 18, 24).

Watson filed her reply on March 23, 2026. (ECF 25). Therefore, the case is ripe for ruling.

For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. FACTUAL AND PROCEDURAL HISTORY

Watson initially applied for SSI and DIB in March 2014, alleging disability beginning

January 11, 2014 (ECF 11 Administrative Record ("AR") 42).[1] Her claim was initially denied on

November 16, 2015, and denied on reconsideration on October 21, 2016. (AR 29, 42). Watson

then appealed the case to the United States District Court to review the decision, where on

---

[1] The AR page numbers cited herein correspond to the ECF-generated page numbers displayed at the top center of
the screen when the AR is open in ECF, rather than the page numbers printed in the lower right corner of each page.

November 8, 2017, the case was affirmed. (AR-2 830-39). The case was then appealed to the Seventh Circuit Court of Appeals and remanded by agreement of the claimant and the Commissioner to district court on October 16, 2018. (AR 904). The district court then vacated the prior order and remanded back to the Social Security Administration on December 3, 2018. (AR 936-38).

During the ongoing litigation of the 2015 unfavorable decision, Watson filed another application for DIB and SSI on January 11, 2017, alleging disability beginning on November 17, 2015. (AR-3 120, 122). Her claim was initially denied on November 21, 2018, and the Appeals Counsel vacated the 2018 unfavorable decision and consolidated the applications into one claim and granted rehearing. (AR 905-29, 942-45).

On rehearing, the ALJ returned an unfavorable decision on April 7, 2020. (AR-2 598-625). Watson again appealed the case to district court, and the court reversed and remanded the case back to the SSA on October 18, 2021. (AR-2 697-711). Upon remand, the Appeals Counsil consolidated the case with Watson's subsequent applications filed in 2020 for a new hearing. (AR-2 714-15).

On this next rehearing, the ALJ again returned an unfavorable decision on October 24, 2022. (AR-2 490-513). Watson again appealed the case to district court and the court remanded on November 16, 2023. (AR-6 716).

During that litigation, Watson filed a final application for SSI and DIB and in March 2024, the Appeals Council consolidated this application with the ongoing 2014 claim. (AR-6 721-24). On rehearing for this consolidated SSI and DIB application from March 2014, alleging disability as of January 11, 2014, the ALJ returned another unfavorable decision on February 26, 2025. (AR-6 544-79).

On October 10, 2024, Watson appeared for a phone hearing before Administrative Law Judge (ALJ) Terry Miller. (AR-6 544). Watson was represented by counsel, and vocational expert (VE) Mary Harris and medical expert David B. Peterson, Ph.D., also appeared. (*Id.*). The ALJ issued an unfavorable decision on February 26, 2025, concluding that Watson was not disabled because she was capable of performing a significant number of unskilled, sedentary jobs in the national economy. (AR-6 579). Because this case has been previously remanded, the ALJ's decision is the final decision of the agency. 20 C.F.R. §§ 404.981, 416.1581; *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010).

Watson filed a complaint in this district court requesting review of the Commissioner's final decision on June 27, 2025. (ECF 1). In this appeal, Watson alleges the ALJ erred by ignoring lines of contrary evidence and in considering mental health evidence. (ECF 18 at 8).

On the date of the Commissioner's final decision, Watson was forty-four years old and had at least a high school education and   no past relevant work (AR-6 577). Watson alleges disability due a learning disability, bipolar depression, anxiety disorder, paranoia, and memory loss. (AR 380).

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner …, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed "only if [it is] not supported by substantial

evidence or if the Commissioner applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Id.* (collecting cases). "Rather, if the findings of the Commissioner … are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III. ANALYSIS

#### A. The Law

Under the Act, a claimant seeking DIB or SSI must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment … which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also id.* §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring the ALJ to consider sequentially whether:

> (1) the claimant is presently employed [in substantial gainful activity]; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's [RFC] leaves

4

[her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Pufahl v. Bisignano*, 142 F.4th 446, 452-53 (7th Cir. 2025) (citation omitted); *see also Sevec v. Kijakazi*, 59 F.4th 293, 298 (7th Cir. 2023); 20 C.F.R. §§ 404.1520, 416.920. "Between the third and fourth steps, the ALJ determines the claimant's [RFC], which is the claimant's maximum work capability." *Pufahl*, 142 F.4th at 453 (citations omitted); *see also* 20 C.F.R. §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). "The burden of proof is on the claimant for the first four steps." *Fetting v. Kijakazi*, 62 F.4th 332, 336 (7th Cir. 2023) (citation omitted). "At step five, the burden shifts to the [Commissioner] to show that there are significant numbers of jobs in the national economy for someone with the claimant's abilities and limitations." *Id.* (citation and internal quotation marks omitted). "If at any step a finding of disability or nondisability can be made, the Social Security Administration will not review the claim further." *Sevec*, 59 F.4th at 298 (citation and brackets omitted).

## B. The Commissioner's Final Decision

At step one, the ALJ found Watson had not engaged in substantial gainful activity since January 11, 2014, the alleged onset date. (AR-6 548). At step two, the ALJ found that Watson had the following severe impairments:

> seizure disorder/pseudoseizures; lumbar spine degenerative disc disease /scoliosis; migraine headaches; sleep apnea; obesity; asthma/COPD with history of smoking; right shoulder rotator cuff tendinosis/tear, status post decompression surgery in May 2022; left shoulder pain/left rotator cuff tendinitis; carpal tunnel syndrome; chronic ankle pain/traumatic osteoarthritis of the right ankle, status post repair surgery; unspecified neurodevelopmental disorder/borderline intellectual functioning , major depressive disorder/episodic mood disorder, anxiety/panic disorder, and unspecified posttraumatic stress disorder; and chronic pain syndrome.

(*Id.*). At step three, the ALJ found Watson did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20

5

C.F.R. Part 404, Subpart P, Appendix 1. (AR-6 549).

The ALJ assigned Watson the following RFC:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; never climbing ladders, ropes, or scaffolds; [] only frequent bilateral overhead reaching; only frequent bilateral handling and fingering; should avoid all exposure to hazards, defined as operational control of dangerous moving machinery, work at unprotected heights, and work around slippery/uneven/moving surfaces; should avoid concentrated exposure to pulmonary irritants, including fumes, odors, dust, gases, poorly ventilated areas and chemicals; should avoid concentrated exposure to extreme cold, heat, and humidity; should avoid concentrated exposure to loud noise (level 4) and bright/flashing lights. Mentally, the claimant is limited to understanding, carrying out and remembering simple instructions, with the ability to sustain those tasks throughout the eight hour workday without frequent redirection to task; the ability to use judgment in making work -related decisions is limited to making only simple work-related decisions; should not work in an environment that is stringently production or quota based and thus may not perform fast-paced assembly line type of work, but can meet production requirements that allow her to sustain a flexible and goal oriented pace; it is best that the work not involve close scrutiny or frequent critical supervision regarding production rates; work must be in a stable setting where there are no sudden or unpredictable workplace changes in terms of use of work tools, work processes, or work settings, and if there are workplace changes, they are introduced gradually; can maintain the focus, the persistence, the concentration, the pace and attention required to engage in tasks for two hour increments, in an eight hour workday and within the confines of normal work breaks and lunch periods; is limited to superficial interactions with coworkers and supervisors, and should avoid interactions with the general public, with the term superficial interactions defined as occasional and casual contact, not involving prolonged conversations, and contact with supervisors would still involve the need to communicate necessary instructions; prolonged conversation is not needed for task completion with anyone; the claimant is best suited to work in an environment that does not require tandem work activity; and no work requiring more than occasional simple reading/writing and math calculations; and that successful performance of job duties involves primarily working with things or objects and not people although incidental interactions with others or incidental proximity to others as tolerated.

(AR-6 557).

At step four, the ALJ found Watson had no past relevant work. (AR-6 577). However, at step five the ALJ found that a hypothetical individual of Watson's age, education, experience, and RFC could perform a significant number of unskilled, sedentary jobs in the national

economy, including document preparer, electronic assembler, and final assembler. (AR-6 577-78). Thus, Watson's applications for SSI and DIB were denied. (AR-6 579).

*C. Consideration of GAF Scores*

Watson argues the ALJ ignored entire lines of contrary evidence by failing to consider her low Global Assessment of Functioning (GAF) scores and how they support her intellectual impairment diagnoses. (ECF 18 at 10; ECF 25 at 2). "A GAF score is a numerical evaluation, with a range of 0 to 100 of an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (AR-6 576 (internal quotation marks omitted) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders Text Revision 34* (4th ed. 2000)).).

Watson points to several low GAF scores, such as 35, 45, and 55, which she received over the years. (ECF 18 at 11). Although the ALJ did not discuss these particular examples, the ALJ did discuss GAF scores and explained why he gave them little weight.

> The record contains some Global Assessment of Functioning (GAF) scores (e.g., 72F, p 98). A GAF score is a "medical opinion" as defined in 20 CFR 416.927(a)(2), and must be considered with the rest of the relevant evidence. However, it is of limited use in assessing the severity of a mental impairment for several reasons. GAF scores represent a clinician's judgment about the severity of an individual's symptoms or level of mental functioning at a particular moment in time, much like a snapshot. They do not provide a reliable longitudinal picture of the claimant's mental functioning. Such scores are relevant only for the period of time the clinician indicates, which may be considerably less than the period at issue in the case. In addition, a GAF score does not predict prognosis or treatment outcomes. Moreover, the GAF scale does not directly correlate to the severity requirements in our mental disorders listings and this assessment tool has been abandoned in the most current Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders. Because of its drawbacks, the undersigned has not relied on GAF evidence as the primary support for findings of impairment severity or of mental limitations. The undersigned considered the GAF scores in the record, however, for the foregoing reasons, all are assigned little weight.

(AR-6 576). The ALJ further supported the minimal weight given to GAF scores citing the prior

testimony of Nicole Martinez, Psy.D., a medical expert, who "testified GAF scores are no longer used in psychological reporting or assessments since 2015. She stated they are subjective and inconsistent." (AR-6 573-74).

In the Court's previous remand, the ALJ was directed to "reconsider evidence of Plaintiff's GAF scores and whether they are consistent with the record and support Plaintiff's claims of borderline intellectual functioning." (AR-2 709). In that opinion, the Court cited *Yurt v. Colvin* which found that although

> the ALJ was not required to give any weight to individual GAF scores, the problem here is not the failure to individually weigh the low GAF scores but a larger general tendency to ignore or discount evidence favorable to Yurt's claim, which included GAF scores from multiple physicians suggesting a far lower level of functioning than that captured by the ALJ's hypothetical and mental RFC.

758 F.3d 850, 859-60 (7th Cir. 2014) (citations and footnote omitted). In *Yurt*, the court found the ALJ's analysis of the GAF scores especially concerning because the ALJ latched onto the highest GAF score to support a finding of no disability without discussing the low ones. *Id*.

The same concerns in *Yurt* and the previous remands are not present here. In the 2021 remand order, the Court found the ALJ's discussion of Watson's GAF scores to be insufficient, explaining the ALJ's undeveloped analysis was indicative of the ALJ's lack of consideration of adverse evidence. (AR-2 708-09). This lack of consideration of adverse evidence led to the ALJ's finding of no severe impairment in borderline intellectual functioning. (*Id*.). With the finding of no severe impairment in borderline intellectual functioning and a lack of consideration of adverse evidence with the GAF scores, the analysis of GAF score was problematic. (*Id*.).

However, in the decision on appeal now, the ALJ did find borderline intellectual functioning to be a severe impairment. (AR-6 548). Watson is correct that "GAF scores provide support for the diagnosis of Intellectual Development Disorder and Borderline IQ" (ECF 18 at

13), but "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citation omitted). In this case, the ALJ properly explained his reasoning for discounting the GAF scores and was not required to rely on them to any greater degree.

Further, in discounting GAF scores, the ALJ still found support for a severe impairment in borderline intellectual functioning elsewhere in the record. In the previous decisions a broad dismissal of GAF scores was indicative of a general tendency to ignore adverse evidence, but that is not the case here. *See Yurt,* 758 F.3d at 859-60. The ALJ did not cherry pick and choose which GAF scores to take into account, positive or negative, but properly discounted the evidence as a whole. Because the ALJ ultimately found a severe impairment in borderline intellectual functioning, there is no indication that the ALJ ignored adverse evidence. The ALJ properly discounted GAF scores while finding other more persuasive evidence elsewhere in the record to support a severe impairment.

ALJs "are subject to only the most minimal of articulation requirements." *Warnell v. O'Malley,* 97 F.4th 1050, 1053 (7th Cir. 2024); *see also Morales v. O'Malley,* 103 F.4th 469, 471 (7th Cir. 2024) (the minimal articulation requirement is "an obligation that extends no further than grounding a decision in substantial evidence" (citation omitted)). The ALJ articulated why he discounted GAF scores, provided evidence for doing so, but provided weight to similar evidence to find a severe impairment for Watson. The ALJ's decision is supported by substantial evidence.

### *D. Consideration of Evidence in "Ability to Interact with Others"*

Watson argues that the ALJ erred in his consideration of evidence when determining Watson's ability to interact with others. (ECF 18 at 14). Watson points to a variety of evidence

which exemplifies her challenges with interacting with others, however the ALJ acknowledged this evidence and built a logical bridge to his conclusion that Watson has a moderate limitation in this area.

The ALJ need not consider every piece of evidence. *See Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) ("[A]n ALJ doesn't need to address every piece of evidence, but he or she can't ignore a line of evidence supporting a finding of disability." (citation omitted)). However, the ALJ did consider the evidence of Watson's difficulty and how it impacts her employability when assigning a moderate limitation, including Watson's statements for being fired or laid off due to not getting along with others. The ALJ noted the following:

> In an April 2014 report, the claimant indicated she does not get along with anyone (4E)….She also reported she does not want to be around people….She asserted she gets mad when she talks to others and she does not get along with "dumb" people.…She stated she hates big groups and people. She stated she has been fired or laid off due to not getting along with others and her mouth. At the July 2022 hearing, she said she keeps to herself and angers easily. She noted she wants to beat people up and walk off her job because she cannot handle people. She admitted she has never actually hit anyone but just has those thoughts. She reported she can say all kinds of things.

(AR-6 552).

In considering this evidence and Watson's ability to interact with others, the ALJ cited Dr. Peterson's opinion as the only doctor who has reviewed the entire record. (AR-6 552-53). Dr. Peterson explained that this negative evidence was not consistent with a variety of other evidence which evidenced Watson's ability to interact with others. (*Id.*).

Dr. Peterson recommended a moderate limitation, citing the prior administrative medical findings which found a range of mild to moderate limitations in this area. (AR-6 614-15). He commented that an earlier 2014 report noted Watson would have difficulty interacting with all others, but in considering the record, Dr. Peterson thought this was not the case given Watson

had ongoing employment in the past. (AR-6 615). Similarly, in discussing Dr. Aaron Williams' answers to interrogatories, Dr. Peterson found the opinion to be unpersuasive given the objective evidence in the record. (AR-6 616). Dr. Williams gave a marked limitation in interaction with supervisors. (*Id*.). However, Dr. Peterson said this marked limitation is inconsistent with Watson's ability to hold jobs for sustained periods of time although on a part-time basis. (*Id*.). In line with this inconsistency, Dr. Williams himself noted a moderate limitation in interacting with others and the state agency gave no indication of difficulty interacting with supervisors. (*Id*.). Given this evidence, the ALJ noted the evidence that Watson's employability may be impacted by her inability to interact with others, but found Dr. Peterson's analysis of the record persuasive, finding a moderate limitation. The ALJ properly considered Watson's statements about being fired or laid off due to not getting along with others, given the weight applied to Dr. Peterson's opinion and review of the whole record. The ALJ's analysis is proper and supported by substantial evidence.

Watson argues that the ALJ and Dr. Peterson should not have relied on the fact that Watson had sustained a part-time job as evidence of her ability to interact with others because as a security guard, no supervisors or coworkers were present during her working hours. (ECF 18 at 16). With no one present, Watson says, there is little evidence of her ability to interact with others. (*Id*.). However, Watson misses the crux of Dr. Peterson's analysis. Dr. Peterson considers the sheer fact that Watson was able to sustain this job for an extended period of time as evidence that she can interact with others enough to maintain employment. (*See* AR-6 614-16). The characteristics of the job are not important to Dr. Peterson or his analysis.

Further, the ALJ accounted for the moderate limitation and Watson's described challenges in the RFC, limiting her to

superficial interactions with coworkers and supervisors, and should avoid interactions with the general public, with the term superficial interactions defined as occasional and casual contact, not involving prolonged conversations, and contact with supervisors would still involve the need to communicate necessary instructions; prolonged conversation is not needed for task completion with anyone; the claimant is best suited to work in an environment that does not require tandem work activity; …and that successful performance of job duties involves primarily working with things or objects and not people although incidental interactions with others or incidental proximity to others as tolerated.

(AR-6 557).

Watson's ability to sustain employment as a security guard supports the applicability of the crafted RFC. Given the ALJ articulated his reliance on Dr. Peterson's opinion as the only doctor to review the whole record, as well as his opinion's consistency with prior administrative medical findings which found a range of mild to moderate limitations, the ALJ's decision is supported by substantial evidence.

### E. Dr. Boen's Opinion

Watson makes a threshold argument that because this claim was filed before March 27, 2017, it is governed by 20 C.F.R. §§ 404.1527 and 416.927, and the ALJ improperly considered the opinion of Dan L. Boen, Ph.D., HSPP, under these regulations. (ECF 18 at 17). Sections 404.1527(c)(2) and 416.927(c)(2) state that the agency will "give more weight to medical opinions from your treating sources…" This section continues to state that if the agency "find[s] that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." *Id.* Watson is correct that these regulations apply given that her claims were filed prior to 2017, however, Watson incorrectly applies these regulations in her arguments.

A "treating source" is a medical professional who has "an ongoing treatment relationship with you." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Importantly, a medical professional is considered a non-treating source "if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability." *Id.* Dr. Boen does not qualify as a treating source. Dr. Boen evaluated Watson on two occasions (once in 2014 and once in 2023), both for the purposes of disability evaluation. (AR-1 at 1006; AR-6 at 1451). Watson and Dr. Boen had no ongoing relationship, and she only received evaluations for the purpose of being evaluated for disability. Thus, under these regulations, the ALJ was under no directive to given Dr. Boen's more weight or controlling weight. The ALJ need only to evaluate Dr. Boen's opinion as he would any medical opinion.

Otherwise, the ALJ properly considered Dr. Boen's opinion and articulated why he gave it little weight, supporting the decision by substantial evidence. First, the ALJ explained a contradiction in Dr. Boen's testing and analysis. The ALJ found the WAIS-IV and her Full-Scale IQ was 70 to be inconsistent with the finding that Watson "would not have trouble understanding or remembering what to do on a job." (AR-6 575). The ALJ also found the results of the testing to be inconsistent with other evidence in the record such as Watson's "work history, education level, and the fact that she lives alone, drives, and manages her finances independently." (*Id.*). Pointing out this inconsistency is not improper. *See Smallwood-Wolf v. Kijakazi*, No. 1:22-cv-373, 2023 WL 7180473, at *3 (N.D. Ind. Oct. 31, 2023) ("When considering medical source opinions, an ALJ must consider the factors enumerated in the applicable regulations, but then may assign the opinion whatever weight she deems appropriate so long as she 'minimally articulates' her reasoning." (citation omitted)).

Also, Watson seems to be confused about the ALJ's statement that Dr. Boen's opinion

was undermined by later psychometric testing. (*See* AR-6 570; ECF 18 at 20). Watson says it is "unclear what 'psychometric testing' the ALJ is referring to as neither the ALJ nor Dr. Peterson explain what this testing is or where it is found in the record." (ECF 18 at 20 (citations omitted)). Dr. Peterson explained that Dr. Boen's 2014 opinion suggested greater limitations than his 2023 opinion. (AR-6 570, 617). Unlike the 2014 opinion, Dr. Boen's 2023 opinion included psychometric testing. (*Id*.). So, Dr. Peterson and the ALJ suggest that the difference in Dr. Boen's penned limitations from 2014 to 2023 is due to the psychometric testing that occurred alongside the 2023 opinion, but not the 2014 opinion. (*Id*.). This analysis of Dr. Boen's evidence was proper and supported by substantial evidence.

*F. Dr. Peterson's Recommendation for Vocational Rehabilitation*

Lastly, Watson argues the ALJ failed to consider Dr. Peterson's recommendation for vocational rehabilitation. (ECF 18 at 21). This is not an argument which warrants remand. Dr. Peterson stated that he "would recommend the support of vocational rehabilitation services to help [Watson] explore the world of work that's consistent with those limitations and also consistent with [Watson's] interests." (AR-6 620). The Commissioner correctly characterizes Dr. Peterson's recommendation on this point as not one about the nature and severity of Watson's impairments, but rather a recommendation as to services Watson should consider in finding jobs which suit her skills and needs. (*See* ECF 24 at 15). Because this recommendation does not speak to Watson's work capabilities, it does not belong in an RFC. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A) ("An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . he would be hired if he applied for work.").

Instead, Dr. Peterson encouraged Watson to utilize vocational rehabilitation services to find employment in accordance with her RFC. Remand on this point would be improper.

### IV. CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED. The Clerk is DIRECTED to enter a judgment in favor of the Commissioner and against Watson.

SO ORDERED.

Entered this 26th day of May 2026.

/s/ Andrew L. Teel
Andrew L. Teel
United States Magistrate Judge